UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-1113 (DSD/JGL)

Donald G. Cousineau,

Plaintiff,

v. **ORDER**

Norstan, Inc.,

Defendant

James H. Kaster, Esq., Nicholas G.B. May, Esq., and Nichols, Kaster & Anderson, 4644 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

Patricia A. Bloodgood, Esq., Eric C. Tostrud, Esq., and Lockridge Grindal Nauen, 100 Washington Avenue South, Suite 200, Minneapolis, MN 55401, counsel for defendant.

This matter is before the court on the cross-motions of plaintiff and defendant for summary judgment on plaintiff's claims and plaintiff's motion for summary judgment on defendant's counterclaims. Based on a review of the file, record and proceedings herein, the court grants plaintiff's motions for summary judgment and denies defendant's motion for summary judgment.

FILED 7-27-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 7-27-01
Deputy Clerk's Initials ______

**BACKGROUND**

This breach of contract action arises out of a commissions dispute between plaintiff Donald G. Cousineau ("Cousineau") and his former employer, Norstan, Inc. ("Norstan"). Norstan provides equipment, consulting and management services in telecommunications and information systems. Cousineau began his employment with Norstan in 1994 when he was hired to run the Montreal office of Norstan Canada. (May Aff. Tab 1 at 30.) In July 1997, Cousineau transferred from Norstan Canada to Norstan's headquarters in Plymouth, Minnesota to take the newly created position of Director of Strategic Alliances. (Bloodgood Aff. Tab 2 at NI000009.) The negotiations between Norstan and Cousineau concerning the transfer were lengthy and involved Nortsan's general counsel, Jerry Lehrman, and Norstan's Executive Vice President of Area Operations, James Radabaugh. (May Aff. Tab 3 at 28, 30; Bloodgood Aff. Tab 15 at 13-14.) The terms of Cousineau's employment with Norstan, including his compensation, were detailed in a letter dated July 25, 1997 ("Letter Agreement"). (Bloodgood Aff. Tab 2.)

Cousineau's main duties as Director of Strategic Alliances were to locate potential customers and sell Norstan's telecommunications outsourcing services. (May Aff. Tab 3 at 24-25.) Cousineau's Letter Agreement provided that he would be paid a commission of 25 percent of the gross margin on all guaranteed revenue derived from the outsourcing contracts he obtained for

Norstan. (Bloodgood Aff. Tab 2 at NI000011.) The commission was to be calculated using revenues guaranteed for the initial term of the outsourcing contract. (Id. at NI000011-12.) The Letter Agreement further specified that any terminations or deletions to an outsourcing contract during the first ninety days following execution of that contract would be credited against Cousineau's future commissions. (Id.)

The Letter Agreement also called for Cousineau to be paid his entire commission in the initial stages of the outsourcing contracts, not as fees were collected from the customer. (Id.) Commissions were to be paid in two installments, half the commission on the last day of the month following the booking of the contract and the other half ninety days after the acceptance of the installation of equipment and/or commencement of the outsourcing services and commencement of invoicing of equipment or services. (Id.)

During his tenure as Director of Strategic Alliances, Cousineau secured three outsourcing contracts for Norstan: (1) a contract with Grandview/Southview Hospital ("Grandview") in Dayton, Ohio ("Grandview Agreement"); (2) a contract with AmerUs Life ("AmerUs") in Des Moines, Iowa ("AmerUs Agreement"), and (3) a contract with the City of Cedar Rapids, Iowa. The first two contracts are the focus of the present lawsuit.

**1. The Grandview Agreement**

The Grandview Agreement was the first of the three outsourcing contracts secured by Cousineau. (Bloodgood Aff. Tab 1.) The agreement contemplated that Norstan would provide outsourcing services to Grandview for six years. (Id. at NI00209.) The negotiations between the parties were complex and took approximately six months to finalize. (Bloodgood Aff. Tab 3 at 282.) In particular, the parties engaged in lengthy negotiations over two provisions entitled "Termination for Convenience" and "Stranded Costs." (Bloodgood Aff. Tab 9 at 19.) The termination for convenience clause allowed Grandview to terminate the contract prior to the contract's expiration for any reason upon six months notice, but in no case sooner than June 30, 2000. (Bloodgood Aff. Tab 1 at NI00210.) Upon termination for convenience, Grandview would be required to pay an unspecified amount of money to Norstan to compensate it for various termination-related expenditures. (Id.)

Despite Grandview's reservations about these clauses, Matina Clemens signed the agreement on behalf of Grandview on June 11, 1998. On June 18, 1998, Cousineau sent a statement to Jim Guthrie, his supervisor and signatory on the Grandview contract, requesting a net commission of $281,171. (May Aff. Tab 21.) However, Norstan believed that because Grandview could cancel the contract (on six months notice) after two years, Cousineau was owed only $34,610 in

commissions, reflecting the two and one-half years of guaranteed contract revenue. (Bloodgood Aff. Tab 14.) Guthrie gave Cousineau the authority to approach Clemens about removing the termination for convenience clause from the contract, as Guthrie believed the provision was of no value to Norstan. (Bloodgood Aff. Tab 19 at 46, 86.) On August 13, 1998, Cousineau and Clemens met and Clemens initialed a page that deleted the clause. (Bloodgood Aff. Tab 8 at 62-63; Tab 16.) After confirming that Clemens' intent was to delete the clause, Guthrie initialed the deletion on behalf of Norstan. (May Aff. Tab 25; Bloodgood Aff. Tab 8 at 64-67.)

On September 24, 1998, Cousineau received an e-mail from Guthrie stating that Clemens had changed her mind and that she wanted the clause reinserted. (Bloodgood Aff. Tab 17.) Despite Grandview's desire to reinsert the clause in the agreement, no written amendment effectuating this change has ever been made. Nevertheless, Norstan has continued to treat the Grandview Agreement as a two-year contract and has refused to pay Cousineau any commissions related to the four additional years on the contract.

**2. The AmerUs Agreement**

In 1998, Cousineau also negotiated an outsourcing contract with AmerUs Life, an insurance company located in Des Moines, Iowa. (Bloodgood Aff. Tab 4.) The AmerUs Agreement contemplated that Norstan would provide telecommunications equipment and personnel,

together with long-distance and local network services to AmerUs for a term of seven years. (Id.) The parties extensively negotiated the provision in the agreement regarding the number of long distance minutes that AmerUs would be required to purchase from Norstan. (Bloodgood Aff. Tab 25 at 27-28, 30-31, 59.) The final contract contained a detailed fee schedule outlining the long distance rate per minute and the number of minutes per year to be used by AmerUs. (Bloodgood Aff. Tab 4.) The contract also stated that the rate structure was based on a "total guaranteed gross usage of 56,923,026 minutes" and that if AmerUs' annual usage was less than provided for in the fee schedule, the rate would be readjusted. (Id.)

The agreement was executed by AmerUs on September 29, 1998, and by Guthrie on behalf of Norstan of October 12, 1998. Based on his understanding that the number of long distance minutes set forth in the contract and the revenue derived therefrom were guaranteed, Cousineau presented Guthrie with a commission statement for the AmerUs Agreement claiming a commission of $549,766. (Bloodgood Aff. Tab 20.) Norstan paid Cousineau an initial installment of $274,888, with the second installment due on January 31, 1999. (Bloodgood Aff. Tab 21.) However, Norstan later claimed that the long-distance portion of the revenue should not have been characterized as guaranteed revenue, and on that basis Norstan refused to pay Cousineau the second installment on the AmerUs

commission. (Bloodgood Aff. Tab 29 at 46.) Norstan later learned that it was not licensed to sell long-distance minutes to AmerUs, therefore on May 21, 1999, Norstan and AmerUs agreed to delete that portion of the contract. As a result, Norstan never provided long distance service to AmerUs.

In view of Norstan's refusal to pay what Cousineau believes are the full amounts due on the Grandview and AmerUs Agreements, Cousineau has sued Norstan for breach of contract (Counts I and II), unjust enrichment (Count III) and violation of Minn. Stat. § 181.14 for failure to pay wages promptly (Count IV). Norstan counterclaims against Cousineau alleging fraud, fraudulent concealment, negligent misrepresentation, breach of fiduciary duty, unjust enrichment and breach of contract. Both parties now move for summary judgment on Cousineau's claims. In addition, Cousineau moves for summary judgment on Norstan's counterclaims.

## DISCUSSION

### I. Standard of Review

To prevail on a motion for summary judgment, the moving party must demonstrate to the court that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c). For purposes of summary judgment, a fact is material only when its resolution affects the outcome of the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for the nonmoving party. Id. No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. However, if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 623 (8th Cir. 1981). The construction and effect of a contract is a question of law, unless an ambiguity exists. Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). An ambiguity exists where contract language, given its plain and ordinary meaning, is reasonably susceptible to more than one interpretation. Id.; Employers Mut. Liab. Ins. Co. v. Eagles Lodge, 165 N.W.2d 554, 556 (Minn. 1969). Where ambiguity exists, extrinsic evidence may be

consulted and construction of the contract becomes a question of fact, requiring the court to view the evidence in a light most favorable to the nonmovant before granting summary judgment. Swanson v. Parkway Estates Townhouse Ass'n, 567 N.W.2d 767, 768 (Minn. Ct. App. 1997).

## II. Cousineau's Claims

### A. Breach of Contract

Cousineau claims that Norstan has breached the unambiguous terms of the Letter Agreement by failing to pay him the proper commissions on the Grandview and AmerUs outsourcing agreements. Specifically, he alleges that Norstan's interpretation of the "guaranteed" revenue provision in the Letter Agreement is unreasonable, therefore, Norstan's calculation of the commissions owed under the Grandview and AmerUs contracts is erroneous.

#### 1. The Grandview Agreement

With respect to the Grandview Agreement, the issue before the court is whether the amendment signed by Clemens and Guthrie in August 1998 impacts Cousineau's commissions. Cousineau contends that the by red-lining and initialing the termination for convenience provision, Clemens and Guthrie effectively deleted that provision from the contract within ninety days of its execution, therefore Norstan owes commissions on the entire six-year term of the contract. Norstan asserts that neither party to the agreement considers that the contract was modified by their actions.

The evidence establishes on August 13, 1998, Clemens initialed an amendment to the Grandview Agreement which removed the termination for convenience provision. On August 25, 1998, Guthrie initialed the amendment on behalf of Norstan. The record also indicates that Guthrie initialed the agreement only after contacting Clemens specifically to determine her intent regarding the amendment. In an e-mail directed to Kevin Paulsen, a supervisor of both Guthrie and Cousineau, Guthrie wrote that he had confirmed that Clemens "has in fact agreed that the hospital has a six year contract, not two" and that Clemens "has deleted the cancellation for convenience clause from the contract." (May Aff. Tab 25.) Having confirmed Clemens's intent, Guthrie added his initials to the amendment.

It is undisputed that both Clemens and Guthrie have authority to bind their respective companies to the agreement. (Bloodgood Aff. Tab 8 at 9, 14; Tab 19 at 62.) Nevertheless, Norstan argues that it "became clear" only weeks later that Clemens had not intended to give up Grandview's right to terminate at its convenience after two years. (Bloodgood Aff. Tab 17.) Despite these assertions, the deletion is legally effective and unambiguous and no written agreement restoring the termination provision to the contract has ever been consummated. To the extent that extrinsic evidence of Guthrie and Clemens's subsequent conversations must be considered, a reasonable juror reviewing that evidence would likely

conclude that, as of August 25, 1998, the parties to the Grandview Agreement intended to and had effectively deleted the termination for convenience provision.

The net effect of the amendment was to convert the guaranteed term of the Grandview contract from two years to six years. Cousineau's Letter Agreement provides that any modifications to outsourcing contracts which occur within ninety days of execution of the contract shall be taken into consideration when calculating commissions due.[1] Because the amendment eliminating Grandview's right to terminate occurred within ninety days of the June 11, 1998, execution date of the contract, Cousineau's commission should have been calculated assuming six years of guaranteed revenue rather than two. (Bloodgood Aff. Tab 2 ¶ 8.) Accordingly, under the plain language of the Letter Agreement, Norstan owes Cousineau his commissions for the balance of the Grandview contract.

**2. The AmerUs Agreement**

The principal issue before the court with respect to the AmerUs Agreement is whether the revenue from the 56,923,026 minutes set forth in the contract is guaranteed and therefore should have been included in Cousineau's commission calculation.

---

[1] The Letter Agreement specifically provides that "[o]utsourcing revenues, for commission purposes as noted herein, shall not include renewals, modifications, extensions, add-ons or similar changes to the initial outsourcing contract for such customer unless they occur within ninety (90) days after execution of the outsourcing contract by the customer and the Company." (Bloodgood Aff. Tab 2 ¶ 8.)

The final contract between AmerUs and Norstan contains a year-to-year fee schedule which outlines the number of minutes per year to be used by AmerUs and the long distance rate per minute which AmerUs can secure if it meets the annual usage projections. It also contains a paragraph which sets forth the usage terms over the life of the agreement:

> Network rates and prices are based upon a total guaranteed gross usage of 56,923,026 minutes over the life of the agreement. Network annual rates per minute are guaranteed for the life of the Agreement. If actual usage is less in any one year than the minutes represented above, the rate for that year will be readjusted to equal the rate of the previous year. This adjustment would be made annually at the Agreement anniversary date. Network services fees will be billed monthly based on actual volumes/minutes used.

(Bloodgood Aff. Tab 4 at NI000555)(emphasis added).

Norstan contends that this language makes clear that AmerUs was required to pay only for the volume of minutes that it actually used, and if that annual usage was less in any given year than the fee schedule set forth, the rate would be adjusted. While this interpretation accurately describes the short term application of these provisions, the contract as a whole unambiguously requires AmerUs to pay for 56,923,026 minutes over the life of the contract. The fee schedule merely provides the structure whereby AmerUs can secure those minutes at a financially favorable rate. If AmerUs meets or exceeds the targeted annual usage, it is rewarded with lower rates the following year. If it fails to use enough minutes

per year to secure the low rates, it loses the rate decrease. Under either scenario, AmerUs is still responsible for the purchase of 56,923,026 minutes over the seven years of the agreement, although its failure to do so would potentially require Norstan to sue Grandview for breach of contract.[2] In short, the fee schedule and associated contract language are unambiguous provisions which represent the minimum amount of revenue that Norstan could expect under the agreement, therefore Cousineau is due a commission which is based on AmerUs's compliance with the fee schedule.[3]

To the extent that the contract is susceptible to any other interpretation, the extrinsic evidence in this case supports the court's conclusions. The fee schedule and associated provisions was the result of three months of negotiation, during which time the number of minutes that AmerUs was required to purchase was reduced from 90 million minutes to 56 million minutes. (Bloodgood Aff. Tab 25 at 45, 49, 59.) Krieg agreed that long distance service contracts typically contain such usage minimums and he

---

[2] Lance Krieg, the individual who negotiated the contract for AmerUs, suggested at his deposition that the more typical course of events would be for the parties to renegotiate the terms of the agreement minutes. (Bloodgood Aff. Tab 25 at 32.) In any case, Norstan clearly had the right to insist on payment for the total number of minutes set forth in the contract.

[3] The court notes that because Norstan is authorized to penalize AmerUs by charging subsequent minutes at a higher rate, Norstan has the potential to earn even higher revenue than anticipated by the fee schedule. This would represent revenue on which Cousineau will apparently earn no commissions.

specifically understood that this contract bound AmerUs to "use a guaranteed minimum of 56 plus million minutes over the life of the agreement." (Id. at 56.) Krieg also testified that by the time the agreement was signed he was "comfortable that we (AmerUs) could meet the number of minutes that were contemplated in the contract." (Id. at 30.)

Norstan points to a prior draft of the agreement which contained a provision that "should the total gross usage minutes volume not be met within the 84-month period, the network services agreement will remain in force until the volume commitment is met." (Bloodgood Aff. Tab 31 at AL000066.) Although the elimination of this provision from the final agreement evinces AmerUs's intent that the contract not extend beyond Year 7, it stretches logic to suggest that without this provision, AmerUs is able, as a matter of law, to escape its responsibilities during the actual term of the contract. Even Krieg noted in his deposition that the elimination of this provision would allow him only to make the argument at the end of the seven years that the minute commitment was not guaranteed. (Bloodgood Aff. Tab 25 at 119-120.) Therefore, even if consideration of the extrinsic evidence were necessary, a reasonable factfinder would likely conclude that AmerUs understood at the outset that it was obligated to purchase the entire 56 million minutes.

Norstan points out that it was later forced to remove the long distances services provision (and the potential revenue associated with it) from the contract with AmerUs when it discovered that it was not licensed to provide long distance service. (Bloodgood Aff. Tab 24 at 124-28; May Aff. Tab 38.) However, the long-distance services provision was not deleted from the contract until May 21, 1999, seven months after the original agreement was executed. (May Aff. Tab 37.) Because the amendment occurred well beyond the 90-day post-execution time frame contained in the Letter Agreement, it has no impact on Cousineau's entitlement to the full commission.

The court also rejects Norstan's claim that it is authorized under the Letter Agreement to reduce the second installment of Cousineau's commission on the AmerUs contract because the long-distance services provision was eventually eliminated. Cousineau's Letter Agreement does provide that "[t]erminations and/or deletions of the outsourcing contract <u>at any time</u> during the initial term of such contract shall be credited for the purposes of calculating future commissions earned under this letter of agreement...." (Bloodgood Aff. Tab 2 ¶ 8)(emphasis added). While this language unambiguously allows Norstan to reduce commissions from <u>future sales</u> to reflect changes to existing contracts, it does not give Norstan the authority to limit or reduce Cousineau's <u>existing</u> AmerUs commission to reflect the deletion of the network portion of that agreement. Even if it did, the court notes that Norstan did

not remove the long distance services provision until May of 1999, so Norstan could not have raised this as an issue in February of 1999, when the second installment on the AmerUs commission was due.

For these reasons, the court concludes that Cousineau is entitled to commissions on the AmerUs Agreement based on the guaranteed purchase by AmerUs of 56,923,026 long distance minutes.

**B. Claim Under Minn. Stat. Ann. § 181.14**

Minn. Stat. Ann. § 181.14 states in relevant part:

> Subdivision 1. (a) Prompt payment required. When any such employee quits or resigns employment, the wages or commissions earned and unpaid at the time the employee quits or resigns shall be paid in full not later than the first regularly scheduled payday following the employee's final day of employment ...
>
> Subd. 2. Nonprompt payment. Wages or commissions not paid within the required time period shall become immediately payable upon the demand of the employee.

Minn. Stat. Ann. § 181.14.

Based on the court's conclusion that Norstan has failed to pay Cousineau the entire amount of commissions owed to him under the Letter Agreement, Norstan has violated Minn. Stat. Ann. § 181.14 and Cousineau is entitled to all remedies available to him under the statute.

**C. Unjust Enrichment**

As an alternative theory to his breach of contract and statutory claims, Cousineau alleges that Norstan has been unjustly enriched by its retention of commissions due and owing to him.

Neither party has fully briefed this claim, and as the court has ruled in favor of Cousineau on his breach of contract claims, the court will not address this alternative theory of liability.

**III. Norstan's Counterclaims**

Cousineau has moved for summary judgment as each of the six counterclaims raised by Norstan.

**A. Fraudulent Misrepresentation**

Norstan alleges that Cousineau fraudulently misrepresented the commissions owed him on the Grandview and AmerUs Agreements. Norstan's primary allegation is that Cousineau overinflated his commissions statements by claiming as guaranteed revenue amounts which were not guaranteed under the Grandview and AmerUs Agreements. This allegation merely restates Norstan's theory of defense to Cousineau's breach of contract claim.

Norstan also alleges in its counterclaim that Cousineau did not disclose to Norstan that he made certain "unauthorized promises," including an undisclosed promise to Grandview that its telecommunications costs would not exceed its budget, (May Aff. Tab 14 ¶¶ 83, 96, 105), and an undisclosed promise to AmerUs that it would not be responsible for paying long distance taxes. (Id. ¶¶ 86, 96, 105.) Norstan claims it could not honor these promises, therefore the promises reduced the amount of revenue which Norstan would be able to collect under the agreements. (Id. ¶ 90.) Cousineau disputes these allegations on the merits and also

contends that the claims do not satisfy the requirement that allegations of fraud be pleaded with particularity. Fed. R. Civ. P. 9(b).

After reviewing the counterclaims in their entirety, the court concludes that Norstan's allegations are sufficient to put Cousineau on notice of the conduct at issue. Although it would have been advisable for Norstan to include additional details regarding the circumstances of the alleged fraudulent statements, such as the time and place of the misrepresentations, Bennett v. Berg, 685 F.2d 1053, 1062 (8th Cir. 1982), Norstan sufficiently identified the essential nature of the fraud allegations to put Cousineau on notice of the charges against him. See Abels v. Farmers Comm. Corp., 2001 WL 740870 at *5 (8th Cir. July 3, 2001) (acknowledging that the special nature of fraud necessitates a higher degree of notice, but noting that in order to harmonize the heightened pleading requirement of Rule 9(b) with the basic notice pleading requirement of Rule 8, a plaintiff need only make allegations sufficient to enable defendant to respond specifically, at an early stage of the case, to the allegations against him.)

With respect to the merits of its fraudulent misrepresentation claim, Norstan must establish the following elements:

> (1) There must be a representation; (2) That representation must be false; (3) It must have to do with a past or present fact; (4) That fact must be material; (5) It must be susceptible of knowledge; (6) The representer must know it to be false, or in the

> alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) The representer must intend to have the other person induced to act or justified in acting upon it; (8) The other person must be induced to act or so justified in acting; (9) That person's action must be in reliance upon the representation; (10) That person must suffer damages; and (11) That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of injury.

Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 38-39 (Minn. 1967). See also M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992). When this standard is applied to the facts of this case, Norstan's claim fails on multiple fronts.

First, the court's determination that Cousineau's commission statements are accurate is fatal to Norstan's claim that Cousineau made false statements regarding the amounts due to him on the Grandview and AmerUs contracts. Moreover, there is no evidence that Cousineau's commission statements were knowingly false or were delivered to Norstan with an intent to deceive Norstan. Fraudulent misrepresentation is an intentional tort and thus requires proof of scienter, or "fraudulent intent." Florenzano v. Olson, 387 N.W.2d 168, 173 (Minn. 1986). "Fraudulent intent" includes statements made with a purpose to deceive, as well as statements made "positively and without qualification," with either conscious ignorance of the truth or recognition that "the information on which he or she relies is not adequate or dependable enough to support such a positive, unqualified assertion." Id. Absent some

indication that Cousineau knew that his revenue projections were false or that Cousineau was consciously ignorant of underlying errors in his commission statements, no reasonable juror would find him liable for fraudulent misrepresentation.

On this point, Norstan asserts that Cousineau was well aware that AmerUs had negotiated for the removal of a provision that would have extended the term of the contract until all long-distance minutes had been used, yet he submitted a commission statement which treated the long distance revenue as guaranteed. Norstan also emphasizes that Cousineau submitted his claim for commissions on six years of Grandview revenue before he secured the amendment, which Norstan claims evinces Cousineau's deceptive intent. These assertions do not provide a sufficient basis for a jury to conclude that Cousineau acted in bad faith.

Similarly, Norstan's allegations that Cousineau made unauthorized promises to Grandview and AmerUs which cost Norstan revenue do not support a claim for intentional fraud. First, with respect to Cousineau's alleged promise to Grandview that Norstan's fees for outsourcing services would not exceed Grandview's budget for the prior year, such a promise, assuming it was made, is not actionable because it relates to a future condition, not to a past or present fact. As the Minnesota Court of Appeals stated in Dollar Travel Agency, Inc. v. Northwest Airlines, Inc., 354 N.W.2d 880, 883 (Minn. Ct. App. 1984), "[f]raud must relate to a past or

existing fact and cannot be predicated on statements of intention or opinion."

Moreover, the record establishes that another Norstan employee involved in the contract negotiations with Grandview was aware of Cousineau's discussions with Grandview regarding its prior year's budget. Specifically, Allan Hamula, Director of Managed Services, testified that Cousineau made statements to Grandview representatives on this issue. (Bloodgood Aff. Tab 10 at 59-60.) Hamula also testified that it was apparent from the contract itself that Norstan was not able to meet Grandview's budgetary demands. (Id. at 116.) On this record, Norstan cannot demonstrate detrimental reliance on an alleged undisclosed promise to Grandview.

With respect to Cousineau's alleged promise to AmerUs that AmerUs would not be responsible for paying new taxes on the long distance portion of the outsourcing agreement, the court notes that Lance Krieg, the AmerUs representative who negotiated the contract, denies that Cousineau ever made such a statement. (Bloodgood Aff. Tab 25 at 66-67, 70.) The fact that Cousineau apparently did not make the alleged promise is obviously fatal to Norstan's claim of fraudulent misrepresentation.

Finally, the court shares in Cousineau's concern that Norstan is attempting to state a claim that it has no standing to assert. In short, the court finds that Norstan's novel attempt to sue a

former salesman for his allegedly fraudulent misrepresentations to customers has no support in fact or law. Therefore, summary judgment in favor of Cousineau on this claim is appropriate.

**B. Negligent Misrepresentation**

Minnesota has adopted the definition of negligent misrepresentation provided by the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Bonhiver v. Graff, 248 N.W.2d 291, 298-99 (Minn. 1976). The court's disposition of Norstan's fraudulent misrepresentation claim is also dispositive of its negligent misrepresentation claim. See Florenzano, 387 N.W.2d at 173-74 (noting that negligent misrepresentation consists of the same elements as fraudulent misrepresentation, with the exception that proof of intentional falsity, ignorance or deception is not required.)

**C. Fraudulent Concealment**

Norstan also claims that Cousineau's failure to disclose the alleged promises to Grandview regarding its budget-related request and to AmerUs regarding the payment of taxes constitute fraudulent disclosure. Nondisclosure of information amounts to a fraud only

when a party is under a duty to disclose information to another party. Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976). Under Minnesota law, such a duty can arise: (1) where a party has made a representation and must disclose more information to prevent the representation from being misleading; (2) where a party has special knowledge of material facts to which the other party does not have access; and (3) where a party stands in confidential or fiduciary relation to the other party. Id. Once a duty is established, concealment is fraudulent if "a party conceals a fact material to the transaction, and peculiarly within his knowledge knowing that the other party acts on the presumption that no such fact exists." Exeter Bancorporation, Inc. v. Kemper Sec. Group, Inc., 58 F.3d 1306, 1314 (8th Cir. 1995) (quoting Thomas v. Murphy, 91 N.W. 1097, 1098 (Minn. 1902)).

Assuming without deciding that Cousineau's relationship to Norstan satisfies the duty element, Norstan has not established the other essential elements of this claim. First, the court reiterates that the evidence supports the conclusion that Cousineau never made any promises to AmerUs regarding their future tax obligation, therefore he cannot be found liable for concealing such a statement. (Bloodgood Aff. Tab 25 at 66-67, 70.) In addition, the record clearly indicates that another individual involved in the Grandview contract negotiations on behalf of Norstan was aware that Cousineau had engaged in discussions with Grandview regarding

its budget. (Bloodgood Aff. Tab 10 at 59-60.) Therefore, Cousineau's representations to Grandview were neither concealed nor peculiarly within his knowledge. Finally, the secret deals which Norstan now claims have cost them revenue are not found in either the Grandview or AmerUs contracts, therefore any "undisclosed" or "unauthorized" discussions between the parties regarding these terms are not material to the final written agreements.[4] For these reasons, Norstan's fraudulent concealment claim must be dismissed.

### D. Breach of Fiduciary Duty

Norstan asserts that Cousineau's unauthorized promises to Grandview and AmerUs and the allegedly inflated commission statements he presented to Norstan constitute a breach of his fiduciary duty to his employer. To state a claim for breach of fiduciary duty, Norstan must establish the existence of a duty, a breach of that duty, causation and damages. See Star Ctrs. Inc. v. Faegre & Benson, 2001 WL 605088 at *2 (Minn. Ct. App. June 5, 2000); Writers, Inc. v. West Bend Mut. Ins. Co., 465 N.W.2d 419, 423 (Minn. Ct. App. 1991). Assuming without deciding that the law imposes a special duty on Cousineau toward his employer, the court's disposition of the fraud claims applies equally to the

---

[4] In addition, as Cousineau properly suggests, his alleged promises may very well be inadmissible in court because the parol evidence rule bars a party from arguing that statements made prior to the execution of an unambiguous final written agreement constitute substantive terms of the contract. LeNeave v. North Am. Life. Ass. Co., 854 F.2d 317, 320 (8th Cir. 1988); Sullivan v. United States, 363 F.2d 724, 727 (8th Cir. 1966.)

fiduciary duty claim. Specifically, absent evidence that Cousineau concealed his discussions with Grandview from Norstan, made any authorized promises to AmerUs or submitted false commission estimates, Norstan cannot establish that Cousineau breached his fiduciary duty. The court therefore concludes that Cousineau's motion for summary judgment with respect to a breach of fiduciary duty must be granted.

**E. Breach of Contract**

Norstan's claim for breach of contract rests on its contention that Cousineau submitted fraudulent commission statements in breach of his Letter Agreement. In light of the court's finding that Cousineau neither fraudulently inflated his commission statements nor submitted untrue commission statements, summary judgment in favor of Cousineau on this claim is granted.

**F. Unjust Enrichment**

Finally, as an alternative to its breach of contract counterclaim, Norstan asserts that Cousineau was unjustly enriched by falsely inflating the commission calculations he provided to Norstan. To establish a claim of unjust enrichment, Norstan must show that Cousineau knowingly received something of value to which he was not entitled and under circumstances that would make it unjust to permit its retention. Southtown Plumbing, Inc. v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992). As explained by the Minnesota courts:

> A claim for unjust enrichment does not lie simply because one party benefits from the actions of another; rather, the term "unjust enrichment" is used in the sense that the benefit has been gained illegally or unlawfully. First Nat'l Bank of St. Paul v. Ramier, 311 N.W.2d 502, 504 (Minn. 1981). An action for unjust enrichment may be founded upon failure of consideration, fraud, or mistake, or "situations where it would be morally wrong for one party to enrich himself at the expense of another."

Holman v. CPT Corp., 457 N.W.2d 740, 745 (Minn. Ct. App. 1990) (quoting Anderson v. DeLisle, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984)). A claim for unjust enrichment will not lie where one has a legal remedy or valid contract. Id.

In this case, the record contains no facts to suggest that Cousineau benefitted unlawfully or wrongfully. The court has interpreted the employment contract between Cousineau and Norstan, as well as the agreements Cousineau secured on behalf of Norstan and concludes that is entitled to the commissions which he requested. Thus, summary judgment in favor of Cousineau on Norstan's unjust enrichment claim is also granted.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment on plaintiff's claims is denied.

2. Plaintiff's affirmative motion for summary judgment on its claims is granted.

3. Plaintiff's motion for summary judgment on defendant's counterclaims is granted.

**LET THE JUDGMENT BE ENTERED ACCORDINGLY**

Dated: July 26, 2001

David S. Doty, Judge
United States District Court

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500